PAUL E. POLZIN, Appellant, *vs.* RAND, McNALLY & CO.
*et al.* Appellees.

*Opinion filed June 20, 1911.*

1. CONSTITUTIONAL LAW—*an act which would render a public school law ineffectual would be invalid.* It is the constitutional duty of the General Assembly to provide a thorough and efficient system of free schools whereby the children of the State may receive a good common school education, and any act of the legislature which would make inoperative or render ineffectual laws adopted for the establishment and maintenance of an efficient system of free schools would be invalid.

2. SAME—*the State has right to regulate price of school books.* The State has the right to regulate the adoption and price of text books used in the public schools, and while the possibility that publishers may not comply with the law may go to the question of the wisdom of the law, it does not go to its constitutionality and is not ground for holding such law invalid.

3. SAME—*the legislature may require licensing of public school text books.* Requiring the licensing of all public school text books offered for sale in the State is a provision in aid of the power of the State to regulate the adoption and price of such books, and in enacting such provision the legislature has the right to assume that the publishers will comply therewith.

4. SAME—*publishers cannot, by defying School Text-book law, render it invalid.* The legislature cannot compel publishers of public school text books to license their books but it may make the licensing of such books a condition precedent to the right to sell them in the State, and the publishers cannot, by defying the law, render it invalid, even though their action may result in temporarily closing the schools.

5. SAME—*School Text-book law requires licensing of all text books used in public schools.* The effect of the School Text-book law of 1909 is to require the licensing of all text books used in the public schools and not merely a part of such books.

6. SAME—*fixing maximum price for part of text books and not for all is not a discrimination.* The fixing by the School Text-book law of 1909 of a maximum price for a part of the text books offered for sale in the public schools but not for all is not such an unreasonable classification or discrimination as renders the act unconstitutional.

7. SAME—*School Text-book law of 1909 is invalid because of provision for advertising for bids.* Section 6 of the School Text-

2 5 0 — 3 6

book law of 1909, requiring school boards, before adopting text books, to advertise for bids by publishing a notice in one or more newspapers of general circulation "published in the district," means in a newspaper first issued or printed in the district and not elsewhere, and as such provision is impossible of performance it is invalid, and as it is inseparable from the remainder of the act the entire act is invalid.

8. SAME—*classification of school districts, based upon whether or not a newspaper is published there, would be invalid.* Section 6 of the School Text-book law of 1909 was not intended to classify school districts of the State upon the basis of whether or not a newspaper of general circulation is published therein, nor would such a classification be valid were it intended to be made.

9. NOTICE—*what is meant by a newspaper of general circulation.* A newspaper is of general circulation when it circulates among all classes and is not confined to a particular class or calling in the community.

CARTER, C. J., dissenting.

APPEAL from the Circuit Court of Cook county; the Hon. CHARLES M. WALKER, Judge, presiding.

SCHUYLER, ETTELSON & WEINFELD, (SAMUEL A. ETTELSON, of counsel,) for appellant:

The circuit court had jurisdiction to enjoin the carrying out of the contract in question at the suit of the complainant, who was a tax-payer. Courts of equity will enjoin, at the suit of a tax-payer, any intended misappropriation of the public money or the payment of such money on an illegal contract. *Adams* v. *Brenan*, 177 Ill. 194; *Holden* v. *Alton*, 179 id. 318.

An investigation concerning the constitutionality of an act of the legislature begins with the presumption that the act is valid, and all doubts or uncertainties arising either from the language of the constitution or the act must be resolved in favor of the validity of the act, and the court will only assume to declare it void in case of a clear conflict with the constitution. The duty of the court is to so construe acts of the legislature as to uphold their constitu-

tionality and validity if it can reasonably be done, and if their construction is doubtful the doubt will be resolved in favor of the law. The act in question is not in any way in contravention of either the constitution of Illinois or that of the United States. *Gaines* v. *Williams,* 146 Ill. 450; *People* v. *Gaulter,* 149 id. 39; *People* v. *Rose,* 203 id. 46; *People* v. *McBride,* 234 id. 146.

The legislature is the supreme law-making body of the State. Section 1 of article 8 of the present constitution provides as follows: "The General Assembly shall provide a thorough and efficient system of free schools whereby all children of this State may receive a good common school education." The act in question was passed in pursuance of this provision of the constitution and is not in contravention thereof. The judgment of the legislature in this regard is sovereign and final and cannot be revised by the courts. The courts may look to see whether the act is in conflict with the constitution, but have nothing to do with the wisdom or unwisdom, with the expediency or inexpediency, of this particular enactment. *Chicago* v. *Green,* 238 Ill. 258; *Curryer* v. *Merrill,* 25 Minn. 1; *State* v. *Haworth,* 122 Ind. 462; *Leeper* v. *State,* 103 Tenn. 500.

The decree of the circuit court was erroneous in finding that the act of 1909 was discriminatory because of its provision for advertising for bids. This provision is general in its terms, and even if there should be school districts in which there could be no advertising because of lack of a newspaper of general circulation, such fact would not make the act discriminatory, because all districts in like circumstances (as to having newspapers) would be governed by the same regulations. *Soap Co.* v. *Chicago,* 234 Ill. 314; *Saylor* v. *Duel,* 236 id. 429; *Potwin* v. *Johnson,* 108 id. 70.

The word "published," as used in the act, means given or sent forth to the public. The obvious intent of the clause is to require public notice, and the meaning of the

word "published" cannot be limited. 7 Words and Phrases, 5847; 32 Cyc. 1258; *State* v. *Bass,* 97 Me. 484.

As the meaning of the word "published" is obvious and the intent is plainly to require publicity, it may be ignored for the purpose of effectuating the legislative intent and the provision may be treated as though the word were not contained in it. *People* v. *Harrison,* 191 Ill. 257; *Walker* v. *Springfield,* 94 id. 364; *People* v. *Hoffman,* 97 id. 234.

Even should the court hold invalid the provision for advertising, still it is separable from the remainder of the statute, and such invalidity will not affect the valid parts of the statute which are complete and enforceable by themselves. *Myers* v. *People,* 67 Ill. 503.

LACKNER, BUTZ & MILLER, for appellee Rand, Mc-Nally & Co.:

The act in question is unconstitutional because it prohibits the use in public schools of unlicensed books but provides no means for securing the licensing of books, and thereby, in effect, enacts that all the schools of this State be closed. Cooley's Const. Lim. (7th ed.) 245; *Powell* v. *Board of Education,* 97 Ill. 375.

The School Text-book act is impossible of performance because ninety-four per cent of the school districts of the State have no newspaper published therein. To provide means for securing competitive bids in six per cent of the districts, only, leaving the other ninety-four per cent of the districts without such means, is grossly discriminative. *Tonawanda* v. *Price,* 171 N. Y. 415; *Leroy* v. *Jamison,* 15 Fed. Cas. 373; *State* v. *Bass,* 97 Me. 484; *People* v. *Olson,* 204 Ill. 494; Cooley's Const. Lim. (7th ed.) 247.

The act in question requires only about one-half of the books used in the public schools to be licensed and fails to require the licensing of certain books required by statute to be used in the public schools. Therefore it imposes heavy burdens upon the publishers of certain school books

which burdens are not imposed upon publishers of other public school books used and required to be used in the public schools. Hurd's Stat. chap. 122, pars. 187, 190; Cooley's Const. Lim. (7th ed.) 586; id. (6th ed.) 481; *Railway Co.* v. *Ellis,* 165 U. S. 150; *Horwich* v. *Laboratory Co.* 205 Ill. 495; *Manowsky* v. *Stephan,* 233 id. 409; *Coal Co.* v. *Harrier,* 207 id. 624; *Mathews* v. *People,* 202 id. 389; *Gillespie* v. *People,* 188 id. 176; *Eden* v. *People,* 161 id. 296; *Millett* v. *People,* 117 id. 294; *Frorer* v. *People,* 141 id. 171; *Ramsay* v. *People,* 142 id. 380; *Off & Co.* v. *Morehead,* 235 id. 40; *Coal Co.* v. *People,* 147 id. 66.

The act, under the guise of an exercise of the police power, places burdens upon the publisher which do not tend to protect the public health, morals, safety or welfare, and the act therefore cannot be sustained as an exercise of the police power. Const. of Ill. art. 2. sec. 2; Const. of U. S. 14th amendment; *People* v. *Steele,* 231 Ill. 345; *Railway Co.* v. *Jacksonville,* 67 id. 37; *Chicago* v. *Netcher,* 183 id 104; *Massie* v. *Cessna,* 239 id. 352; *Noel* v. *People,* 187 id. 587; *Booth* v. *People,* 186 id. 43; *Gillespie* v. *People,* 188 id. 176; *Saddler* v. *People,* 188 id. 243; *Bessette* v. *People,* 193 id. 334; *Price* v. *People,* 193 id. 114; *Frorer* v. *People,* 141 id. 171.

The exclusion of unlicensed text-books from the bidding is an unlawful discrimination, making the act in question unduly oppressive and burdensome. *Chicago* v. *Gunning System,* 214 Ill. 628; *Hawes* v. *Chicago,* 158 id. 653.

FRANK HAMLIN, and ANGUS ROY SHANNON, for appellee the Board of Education of the City of Chicago.

Mr. JUSTICE FARMER delivered the opinion of the court:

The bill in this case was filed by appellant, Paul E. Polzin, as a tax-payer in the city of Chicago, against the board of education of said city and Rand, McNally & Co., also of

the city of Chicago, and other defendants not necessary to be named. The bill alleges that in September, 1909, the board of education adopted for use in the public schools of the city of Chicago, Dodge's Advanced Geography and Dodge's Elementary Geography, published by Rand, Mc-Nally & Co., and entered into a contract with said Rand, McNally & Co. whereby said publisher agreed to furnish said school text books to said board of education and to the pupils of said schools at maximum prices in said contract specified. The bill further alleges that said text book has never been licensed as required by an act of the legislature of 1909, entitled "An act in relation to the adoption, use and price of public school text books in the free public schools of this State." The Governor refused to approve the act but failed to return it to the General Assembly during its session with his veto, and failed to file the bill, with his objections thereto, in the office of the Secretary of State within ten days after the adjournment of the General Assembly. The bill therefore became a law without the Governor's signature and went into effect July 1, 1909. The contract between the board of education and Rand, McNally & Co. was for furnishing by the latter Dodge's Advanced Geography to the board of education, or to persons designated by it, at the price of seventy-two cents or to pupils at the price of ninety cents, and Dodge's Elementary Geography to the board of education, or to persons designated by it, at the price of thirty-five cents and to pupils at the price of forty-five cents. The bill alleges that under said act of 1909 the said contract between the board of education and Rand, McNally & Co. is unlawful, and prays an injunction against both parties restraining them from carrying out and performing it.

The answer of the board of education admits failure to comply with the provisions of the act of 1909, and alleges that since the enactment of said law no publisher of any text book has complied with its provisions by licensing any

geography or other school text book, except an arithmetic; that said law is operative only when the publishers voluntarily place themselves under its provisions, and by the failure of publishers to do this the law became and is inoperative, and said board of education was confronted with the alternative of obeying the strict letter of the law by buying no text books, thereby closing the public schools, in violation of its duty under the constitution to maintain said schools, or arranging for such temporary use of such text books as in the judgment of said board was deemed best, so as to perform its duty, under the constitution, to maintain an efficient public school system within its jurisdiction; that at its meeting September 7, 1909, the board of education adopted resolutions setting out this condition; that among other things the resolution recited "that during the emergency created by the conditions hereinbefore set forth, this board temporarily use such text books· as in its opinion are necessary and best for the operation of the schools, and purchase the same in such quantities as they are needed, at the lowest obtainable prices." The answer of Rand, Mc-Nally & Co. relies as a defense upon the unconstitutionality of the act of 1909.

The cause was heard in open court upon bill, answers and replications, oral testimony and a stipulation of facts. The chancellor found and decreed that said act is unconstitutional and dismissed the bill at complainant's costs, and complainant has brought the case to this court by appeal.

Section 1 of the act of 1909 requires the publisher of any text book desiring to offer the same for sale for use in the public schools of this State to file two sample copies of such book in the office of the Superintendent of Public Instruction, together with the list price and the wholesale and retail prices at which said text book is to be offered for sale. The publisher is also required to file with the Superintendent of Public Instruction a written agreement to furnish said text book at the wholesale price so filed, to

the directors of any public school district or any board of education or to any merchant or dealer, and at the retail price so filed, to any patron of the public schools. The agreement is required to guarantee that all books offered for sale and sold in this State shall correspond with and be equal in quality with the copies deposited with the Superintendent of Public Instruction. With such text book so deposited the publisher is required to pay into the State treasury $10, to constitute a fund to be used by the Superintendent of Public Instruction to pay expenses of printing and distributing lists of accredited text books to county superintendents of schools, school directors and boards of education, as required by section 5 of the act. Section 1 forbids the Superintendent of Public Instruction from licensing any publisher, and school directors and boards of education from contracting with any publisher, to furnish any public school text book which shall be sold at retail prices to patrons at a price or prices in excess of the prices fixed for text books enumerated in said section. Then follows a list of maximum prices for text books upon the subjects enumerated. The price of "complete geography" is fixed at seventy-five cents and "elementary geography" at thirty-five cents.

Section 3 requires the publisher depositing with the Superintendent of Public Instruction any text book, to file with said superintendent a bond in the sum of $5000 conditioned for compliance with the agreement filed with said text book, and the Superintendent of Public Instruction shall thereupon enter said text book upon the list of public school text books permitted to be used in the public schools of this State and shall issue a license to the publisher to sell said text book for use in said public schools. For a violation of the agreement the publisher is liable to a penalty in the sum of $2000, to be recovered in an action on the bond in the name of the State.

Section 5 requires the Superintendent of Public Instruction, in February of each year, to furnish county superintendents, boards of school directors and boards of education a list of publishers who have conformed to the requirements of the act, a list and description of accredited school text books and the list prices and wholesale and retail prices of said books. Said section 5 also requires the publisher, before entering into any contract with any board of education or board of directors, to furnish the county superintendent of schools and the secretary of the board of education or board of directors a duplicate printed list of school text books filed by him with the Superintendent of Public Instruction, together with the lowest wholesale and retail prices, and also with samples of the school text books in said list referred to, which lists and samples are required to be preserved as a part of the records of the board of education or board of directors for inspection and examination by school officers, teachers and patrons.

Section 6 is as follows: "Before adopting for use in the public schools under their respective jurisdictions any school text books under the provisions of this act, it shall be the duty of each board of education or board of directors to advertise for bids by publishing a notice once a week for three consecutive weeks in one or more newspapers of general circulation published in the city or district; said notice shall state the time up to which said bids will be received, the time at which they will be opened, which must be at an open meeting of the board of education or board of directors; said notice shall also state the classes and grades for which the text books are to be bought, and the approximate quantity needed; and the said board shall award the contract for said text books to any responsible bidder or bidders offering suitable licensed text books at the lowest prices, taking into consideration the quality of the material used, illustrations, binding, printing, authorship, and all other things that go to make up a desirable

text book: *Provided,* that the said board may reject any and all bids, or any part thereof, and re-advertise therefor, as above provided."

Section 8 provides a penalty of not less than $25 nor more than $500, to which may be added imprisonment not exceeding sixty days in jail, against any publisher, merchant, dealer or other person or persons for demanding or receiving for any school text book any sum in excess of the price for such book filed with the Superintendent of Public Instruction. And section 9 provides that text books shall not be changed oftener than once in five years and shall not be changed in the middle of the school year, and that all changes shall go into effect at the beginning of the first term of school after the summer vacation. Other sections and provisions not referred to are not involved in the decision of this case.

In the brief filed on behalf of the board of education the constitutionality of the act in question is not discussed. The position taken by said board is, that no publisher has complied with the act by securing a license for books desired and necessary to be used in the public schools under its control; that no means are provided for compelling the licensing of said books, and that the board was obliged to procure them for use in the public schools or close said schools, as they could not be conducted without the use of text books. Rand, McNally & Co. (hereafter referred to as appellee) contends that as the law prohibits the use in the public schools of text books not licensed under its provisions and affords no means for securing the licensing of them, the effect of the law is to close the public schools if publishers do not choose to secure the licensing of books, and the law is therefore invalid because it defeats the constitutional mandate of section 1 of article 8 of the constitution.

*First*—It is the constitutional duty of the General Assembly to provide a thorough and efficient system of free

schools, whereby all children of this State may receive a good common school education. (Const. art. 8, sec. I.) Any act of the legislature which would make inoperative and render ineffectual laws adopted for the establishment and maintenance of an efficient system of free schools would be invalid. But is that the necessary effect of the act under consideration, as contended by the appellee? The State has the undoubted right to regulate the adoption and price of text books used in the public schools. This has been decided in several States and we do not understand it is questioned in this case. If the publishers should comply with the law no difficulty could arise in procuring licensed text books required for use in the public schools. The possibility that they will not comply with it may go to the wisdom of the law but we think not to its constitutionality. The wisdom of an act is a legislative question, and however unwise it may be thought to be, unless it violates some provision of the fundamental law it cannot be held invalid. We do not think the validity of the act before us depends upon whether or not publishers will comply with its provisions. The legislature had the right to assume they would, and requiring the licensing of all public school text books offered for sale in this State was a provision in aid of the power to regulate the adoption and price of such books. It may be that this power could be exercised by other methods, but the provision referred to was in aid of the power and not contrary to the constitution. We would be very loath to hold that in any case the validity of an act of the legislature should be determined by whether an individual or corporation affected by it would comply with its provisions. The provision requiring text books offered for sale in this State to be licensed is not different, in principle, from the requirement of section 176 of the School law that only persons having a license or certificate from the county superintendent of schools or the Superintendent of Public Instruction shall be employed to teach in the

public schools. The possibility that no one might apply for and undergo the examination required for a certificate has never been thought to render the law in that regard invalid. We have laws authorizing public work to be let by contract to the lowest bidder, yet the possibility that when bids are advertised for no one will make a bid does not render the law invalid. Other illustrations of similar character might be given. It is true, that up to the time this litigation arose only an arithmetic had been licensed under the provisions of the law; but are we to assume from this that publishers desiring to sell school text books in this State, protected by and exercising rights under our laws, will persist and continue in refusing to perform the acts required of them to entitle them to lawfully sell their books? The legislature could not compel publishers to license their books if they chose not to offer them for sale in this State, but it had the power, as a condition precedent to their right to sell them for use in the public schools of this State, to require them to license them. We are not impressed with the proposition that publishers may, by defying the power of the legislature and ignoring the law, render it invalid. It would be much better that the schools should be temporarily interrupted than that such should be declared to be the effect of the refusal of publishers to comply with the law. The State is not so powerless in the matter of providing school text books as to be at the mercy of the publishers.

*Second*—Appellee contends that the act requires only a part of the text books used in the public schools to be licensed and does not require the licensing of other text books required to be used in the public schools, thus imposing heavy burdens upon publishers of certain text books that are not imposed upon the publishers of other text books, and that the act is discriminative between publishers and also between patrons of the public schools. So far as the contention states that the act requires the licensing of

part of the text books but not of all, it is erroneous. The act requires the licensing of all text books offered for sale for use in the public schools of this State. It also requires that the publishers file with the Superintendent of Public Instruction a list price and the wholesale and retail prices at which the text books are to be sold, together with an agreement in writing to furnish the books at the prices listed. Section 1 provides that the Superintendent of Public Instruction shall not, in any case, license a publisher, and boards of education and boards of directors are prohibited from contracting with any publisher, to furnish any text book which shall be sold at retail to patrons at prices in excess of those specified in the said section. The statute (Hurd's Stat. chap. 122,) requires instruction to be given in the public schools in history of Illinois, the elements of the natural sciences, and such other branches, including vocal music and drawing, as may be prescribed by the directors or the voters of the district at the annual election of directors. The elements of the natural sciences embrace botany, zoology and physics. Text books upon these subjects are required by the act under consideration to be licensed but said act fixes no maximum price at which they are to be sold. Publishers of text books on the history of Illinois, botany, zoology and physics may sell such books (provided they are licensed) to any merchant, dealer, patron or board of education or board of directors at any price the publisher may fix, limited only to the price list filed with the superintendent of public instruction when applying for the license. We do not regard this as an unreasonable classification or discrimination or in violation of any other constitutional provision.

   *Third*—It appears from the stipulations of facts that there are 11,820 school districts in the State and that in 11,198 of them no newspaper is published. Section 6 requires boards of education and boards of directors, before

adopting text books for use in the schools, to advertise for bids "by publishing a notice once a week for three consecutive weeks in one or more newspapers of general circulation published in the city or district." Said section prescribes what said notice shall contain, and requires the contract to be awarded "to any responsible bidder or bidders offering suitable licensed text books at the lowest prices, taking into consideration the quality of the material used, illustrations, binding, printing, authorship, and all other things that go to make up a desirable text book." The provisions of this section are incapable of being complied with if the act is to be construed as meaning what it says, that bids shall be advertised for "in one or more newspapers of general circulation published in the city or district."

Appellant contends (1) that the fact that in some districts no newspaper is published should not render the law invalid because it applies to all districts in which a newspaper is published, and therefore applies alike to all districts under similar circumstances; (2) that the act does not mean the advertisement shall be published in a newspaper printed or issued in the district, but means it shall be in a newspaper circulated in the district, and that the word "published" should be omitted from said section 6. As to the first proposition it is unnecessary to say more than that it is evident there was no intention on the part of the legislature to make any classification of districts with reference to publication of the advertisement for bids, and there is no valid basis for such classification if any such intention were indicated by the language of the act. It would have been competent to have made provision similar to that of the act to regulate the practice in courts of chancery for publication notice to non-resident defendants where no newspaper is printed in the county where the suit is brought, but the language used in the act before us forbids the construction that the legislature meant by "published" in the district "circulated" in the district. We apprehend no one would contend that

it was intended to authorize advertisement in a newspaper circulated, but not published, in a district in which there was a newspaper of general circulation published. Yet if the act is construed as appellant contends for, we see no reason why the advertisement could not be published in any newspaper published outside the district but of general circulation in the district, although there might be one or more newspapers published in the district. A newspaper is of general circulation when it circulates among all classes and is not confined to a particular class or calling in the community. (*Railton* v. *Lauder,* 126 Ill. 219.) Chicago and St. Louis papers have a general circulation in many cities and school districts throughout this State and papers published in other cities and States circulate in Chicago, but the legislature could not have intended that boards of education of Springfield or Cairo could advertise for bids in Chicago or St. Louis newspapers. The language of section 6 is too plain and explicit to admit of the construction contended for by appellant. If it had been intended that publication in a newspaper of "general circulation" in the district should be a compliance with the law, the legislature would not have required that the publication be made not only in a newspaper of general circulation in the district, but also in a newspaper "published" in the district. By the word "published" is clearly meant the place where the newspaper is first issued or printed, to be sent out by mail or otherwise. (*LeRoy* v. *Jannison,* 15 Fed. Cas. 373, opinion by Mr. Justice Field; *State* v. *Bass,* 97 Me. 484; *Village of Tonawanda* v. *Price,* 171 N. Y. 415.) Section 6 is an important provision in carrying out the object and purpose of the act, and other provisions are so related to and dependent upon the said section that without it the act would not be complete for the purpose intended. To eliminate section 6 from the act would cause results not contemplated or desired by the legislature. In such cases the

entire act must be held inoperative. *People* v. *Strassheim,* 240 Ill. 279, and authorities there cited.

It is also contended that the act is unduly oppressive and burdensome upon publishers of public school text books. This is not apparent from an inspection of the act itself, nor was it shown by the proof that in its practical operation it is unduly oppressive and burdensome.

For the reasons stated in division 3 of this opinion we hold the act of 1909 is unconstitutional and invalid.

The decree of the circuit court is affirmed.

*Decree affirmed.*

Mr. CHIEF JUSTICE CARTER, dissenting:

I think the decree in this case should be reversed. I agree with the reasoning of the opinion in all respects except in its holding that the decree of the circuit court rightly held that the law was unconstitutional because of the provisions of section 6 with reference to advertising for bids. This court has held that where the literal enforcement of the statute would cause great inconvenience and great injustice and lead to consequences which the legislature could not have contemplated, the courts are bound to presume that such consequences were not intended and adopt a construction which will promote the ends of justice and avoid the absurdity. (*People* v. *Harrison,* 191 Ill. 257.) The construction put upon said section 6 in the opinion of the court reaches conclusions that the legislature certainly never contemplated. The meaning of the section obviously is to require publicity. The word "publish" may be ignored for the purpose of effectuating the legislative intent and the provision treated as though that word were not contained in the section.